# EXHIBIT A

(TO PLAINTIFF'S ATTORNEY:   PLEASE CIRCLE TYPE OF ACTION INVOLVED:   CONTRACT   TORT
MOTOR VEHICLE TORT          EQUITABLE RELIEF          OTHER)

# Commonwealth of Massachusetts

BARNSTABLE, ss.

SUPERIOR COURT
No.

*BACV 2008-00599A*

*BRIAN WASSER AND
SUSAN QUEALY-WASSER*

VS.

*BANK OF AMERICA, N.A.*

## SUMMONS

To the above-named defendant   :

You are hereby summoned and required to serve upon *BRIAN J. WASSER, ESQ.,
P.O. BOX 1978, HYANNIS, MA   02601* plaintiff's attorney, whose address is
...................................................................................................., an answer to the
complaint which is herewith served upon you, within 20 days after service of this summons upon you,
exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the
relief demanded in the complaint. You are also required to file your answer to the complaint in the office
of the Clerk of this court at Barnstable either before service upon plaintiff's attorney or within a reasonable
time thereafter.

Unless otherwise provided by Rule 13(a), your answer must state as a counterclaim any claim which
you may have against the plaintiff which arises out of the transaction or occurrence that is the subject
matter of the plaintiff's claim or you will thereafter be barred from making such claim in any other action.

**Witness,**   BARBARA J. ROUSE   **Esquire,** at Barnstable, the *28 TH* ..................

day of *OCTOBER* ..................., in the year of our Lord two thousand and *EIGHT* ..................

*Scott W. Nickerson*   Clerk

**NOTE:**   When more than one defendant is involved, the names of all defendants shall appear in the caption. If a
separate summons is issued for each defendant, each should be addressed to the particular defendant.

## NOTICE TO DEFENDANT

You need not appear personally in court to answer the complaint but if you claim to have a defense,
either you or your attorney must serve a copy of your written answer within 20 days as specified
herein and also file the original in the Clerk's office.

*COMMONWEALTH OF MASSACHUSETTS*

BARNSTABLE, SS.

TRIAL COURT OF MASSACHUSETTS
SUPERIOR COURT DIVISION

| | |
|---|---|
| Brian Wasser and Susan Quealy-Wasser )<br>Plaintiffs )<br> )<br>v. )<br>Bank of America, N.A. )<br>Defendant )<br> ) | **COMPLAINT** |

Now Come the Plaintiffs in the above entitled action and aver as follows:

## PRELIMINARY STATEMENT

1.      Plaintiffs institute this action for actual damages, statutory damages, exemplary damages, recision, attorney fees, and the costs of this action against defendant Bank Of America for multiple violations of the Truth in Lending Act, 15 U.S.C. § 1601 *et seq.*, (hereinafter TILA), and Federal Reserve Board Regulation Z, 12 C.F.R. § 226, promulgated pursuant thereto.  Plaintiffs also seeks damages for Defendant's violations of M.G.L. c. 93A and M.G.L. c. 140D.

## PARTIES

2.      Plaintiff, Brian Wasser (hereinafter "Mr. Wasser" or "Borrower") is an individual residing at 43 Forest Glen Road, Hyannis, MA.

3.      Plaintiff, Susan Quealy-Wasser (hereinafter "Mrs. Quealy-Wasser" or "Co-Borrower") is an individual residing at 43 Forest Glen Road, Hyannis, MA.

4.      Defendant, Bank Of America, N.A. (hereinafter "BANK OF AMERICA") is a federal savings bank organized and doing business under the laws of the United States of America and has its corporate headquarters located at 100 North Tryon Street, Charlotte, North Carolina 28255.

## FACTS

5.      At all times relevant hereto, BANK OF AMERICA, in the ordinary course of its business, regularly extended or offered to extend consumer credit for which a finance charge is or may be

imposed or which, by written agreement, is payable in more than four installments, and is the party to whom the transaction which is the subject of this action is initially payable, making defendant a creditor within the meaning of TIL, 15 U.S.C. § 1602(f) and Regulation Z § 226.2(a)(17).

6.    BANK OF AMERICA is an entity engaged in trade or commerce.

7.    On or about January 17, 2007, Borrower, Mr. Wasser, visited his local BANK OF AMERICA branch and signed loan documents for a home loan on his residence at 28 Janice Lane, Hyannis, MA with a BANK OF AMERICA representative.

8.    In or about the end of February or early March of 2007, Borrower received phone calls and phone messages from a company named FISERV concerning a purported problem with the loan documents that required Borrower's assistance and cooperation to cure.

9.    FISERV was described to Borrower as a title company used by and representing BANK OF AMERICA with respect to Borrower's loan.

10.    FISERV said they would send out information to Borrower.

11.    FISERV explained that they wanted to add Borrower's spouse, Mrs. Quealy-Wasser, as an additional borrower on the loan.

12.    Borrower explained that he did not think it was a good idea, did not believe it was necessary and did not think it would go over well with his spouse.  Nevertheless, Borrower agreed to cooperate with BANK OF AMERICA and its title company, FISERV, saw fit.

13.    On or about March 14, 2007, Borrower received a letter from FISERV agent for BANK OF AMERICA.

14.    On or about May 7, 2007, envelope postmarked May 7, 2007, with new mortgage to replace/remedy old mortgage, Borrower did not notice a signature space for himself, as husband, and thought it might be mistake.

15.    On or about May-August,. 2007, Borrower left several phone messages for BANK OF AMERICA, via FISERV, regarding potential problems with the documents they sent by mail.

16.    On or about June 21, 2008, Borrower received a letter from BANK OF AMERICA (FISERV) implying Borrower was being uncooperative.

17.    On or about August 1, 2008, Borrower responded with a letter to FISERV correcting them on past communication problems and updating them on present issues.

18.     On or about August 3, 2007, BANK OF AMERICA, via FISERV, sent a new set of loan documents to Borrower to replace his existing loan documents. There were two exact copies of a Right to Cancel document, both addressed only to Co-Borrower.

       Inside the envelope was:
       1.      Return envelope
       2.      Closing Instructions   (1 page)
       3.      Mortgage               (13 pages)
       4.      Right to Cancel (2)    (2 pages)

19. A true and accurate copy of the loan documentation and mortgage evidencing BANK OF AMERICA's security interest is attached hereto, marked PLAINTIFF'S EXHIBIT A, and by this reference is incorporated herein.

20.     On or about August 5 to August 15, 2007, Borrower called the local BANK OF AMERICA branch to make arrangements to sign loan documents and have them notarized. Borrower was told to come in any time by the local BANK OF AMERICA representatives.

21.     On August 18, 2007, Plaintiffs showed up at the local BANK OF AMERICA branch and were instructed to go to a teller window to sign the documents and have them notarized, which Plaintiffs did and a bank teller conducted the closing.

22.     On August 18, 2007, Plaintiffs visited the local BANK OF AMERICA branch and entered into a consumer credit transaction (hereinafter "the transaction") with BANK OF AMERICA in which the extended consumer credit was subject to a finance charge and which was initially payable to BANK OF AMERICA.

23. As part of this consumer credit transaction, BANK OF AMERICA retained a security interest in 28 Janice Lane, Hyannis, MA , which was Borrower's residence.

24. The security interest was not created to finance the acquisition or initial construction of Borrower's home.

25. BANK OF AMERICA did not provide a copy of the loan documents to plaintiffs on August 18, 2007.

26.     Prior to the closing, Borrower made a copy of the loan documents sent by BANK OF AMERICA via FISERV.

27.     However, the copy of the Notice of Right to Cancel contained therein was not completed and did not contain the date of closing; the date by which she could cancel; and the address to where the notice should be sent, instead the form simply had blank lines.

28.     On August 20, 2007, Co-Borrower exercised her right to cancel by signing the "Notice of Right to Cancel" obtained by the Plaintiffs' self-made copies from the original loan

documentation. Additionally, Co-Borrower offered to return all money and property given by BANK OF AMERICA.

29.    No return address was provided on the "Notice of Right to Cancel" document so Co-Borrower took both the BANK OF AMERICA address from the mortgage document itself (BANK OF AMERICA corporate headquarters) as well as the BANK OF AMERICA customer service address provided on a billing statement, and sent said notice of cancellation, along with an offer to return money and property, to both addresses by certified mail, return receipt requested.

30.    On or about August 26, 2007, Co-Borrower received the signed, return receipt from BANK OF AMERICA (corporate headquarters) for the cancellation notice. (A copy of the cancellation notice, offer to return money and property and the signed certified mail receipt are attached hereto as EXHIBIT B).

31.    More than twenty days have passed since Plaintiffs rescinded the transaction (it has been nearly a year), and BANK OF AMERICA has failed to take any action necessary or appropriate to reflect the termination of any security interest created under the transaction, as required by 15 U.S.C. § 1635(b) and Regulation Z, § 226.23(d)(2). In addition, BANK OF AMERICA has failed to return to the Plaintiffs any money or property given by the Plaintiffs to anyone, including BANK OF AMERICA, as required by 15 U.S.C. § 1635(b) and Regulation Z, § 226.23(d)(2). The procedures prescribed by 15 U.S.C. § 1635 were never altered or amended by any order of court prior to the vesting of substantive rights.

32.    On or about October 15, 2007, Borrower sent a letter to BANK OF AMERICA customer service concerning the cancellation because he was still receiving billing statements even after the notice of cancellation was sent and received by his Co-Borrower.

33.    On or about October 30, 2007, Borrower discovered that the credit line was closed such that no further advances could be drawn from the credit line. Borrower had been receiving numerous harassing phone calls from BANK OF AMERICA and was likely informed of said closure by a BANK OF AMERICA agent reading from BANK OF AMERICA's own computer systems.

34.    On or about November 1, 2007, Borrower received a collection letter from BANK OF AMERICA.

35.    On or about November 8, 2007, someone from BANK OF AMERICA called regarding the line of credit. The call was identified as originating from North Carolina, from the number: (336) 805-9578, and placed at 1:44 p.m.

36a.    On or about November 8, 2007, a BANK OF AMERICA representative called Borrower concerning two past due payments. Borrower informed her about the cancellation of the loan, however, the BANK OF AMERICA agent said the old loan was still in effect if we canceled the second "replacement" loan. Borrower explained that it was the same loan, with the same loan

number, and the same loan amount. The BANK OF AMERICA agent began arguing loudly and talking over Borrower. Borrower attempted to read to her the terms of the contract on the cancellation notice but the BANK OF AMERICA agent ignored Borrower and attempted to put him on hold, after which they were cut off.

36b.    On or about November 9, 2007, Borrower sent a letter dated same to BANK OF AMERICA customer service and to corporate headquarters.

37.    On or about November 21, 2007, Borrower received a collection letter sent by BANK OF AMERICA.

38.    On or about November 29, 2007, Borrower received an unsolicited letter from BANK OF AMERICA dated November 26, 2007, providing a document (signed cancellation notice) they claimed Borrower had requested. BANK OF AMERICA was still disputing the timeliness of the cancellation.

39.    On or about December 4, 2007, Borrower received notice of denial of credit by another creditor due to BANK OF AMERICA reporting Borrower to credit bureaus for default on the home loan, despite the fact that it had been duly canceled. (A copy of a denial of credit letter is attached hereto as EXHIBIT C).

40.    On or about December 6, 2007, Borrower sent a letter to BANK OF AMERICA still trying to sort things out and explain details. Borrower also sought to 'cure' the purported default to protect his credit by sending payment for the balance purportedly due, under protest, in the amount of $1,649.86

41.    On or about January 3, 2008, Borrower sent a letter improperly dated 12/6/07 but in actuality was created and mailed 1/3/08, curing purported default to protect his credit and paid balance purportedly due, under protest, in the amount of $547.72.

42.    On or about December 6, 2007, Borrower received a dated Collection letter from BANK OF AMERICA

43.    The December 6, 2008 letter from BANK OF AMERICA enclosed the old home loan mortgage document, despite Borrower having requested a copy of the latest (most current) home loan mortgage document.

44.    Jeri Priester from BANK OF AMERICA called Borrower at 8:15 p.m. admitting BANK OF AMERICA had been at fault all along, that BANK OF AMERICA was wrong and that they were "working on it."

45.    On or about February 1, 2008, another letter from Borrower was sent to BANK OF AMERICA still protesting the entire situation and trying to resolve their disputes. At the same time, Borrower continued to pay the disputed loan under protest, this time sending a scheduled monthly payment in the amount of $518.66



46.     On or about February 25, 2008, Borrower received a dated letter from BANK OF AMERICA claiming they reported the correction to the credit bureaus and repaired Borrower's credit.

47.     On or about March 16, 2008, Borrower received a call from BANK OF AMERICA # 336-805-0000 @ 3:27 p.m. by a "Brian McMenamin" from Loss Mitigation Department; 800-936-6362 XT. 60801. BANK OF AMERICA representative Mr. McMenamin stated he was calling from Greensboro, North Carolina, and stated that Borrower had thirteen (13) payments past due. BANK OF AMERICA told Borrower the total past due was: $5,920.57.

48.     On or about March 16, 2008, BANK OF AMERICA representative Mr. McMenamin further stated that the loan was a 2nd Mortgage lien on 28 Janice, that is was <u>not</u> an equity line of credit. Borrower asked about a "Jeree" he had heard from who previously called Borrower and informed him that BANK OF AMERICA was "working on it" to imply they agreed Borrower was in the right about the cancellation and BANK OF AMERICA was wrong.

49.     BANK OF AMERICA agent, Mr. McMenamin said her name was "Jeree Porter" out of Buffalo-- at 800-936-6362, extension not available.

50.     The BANK OF AMERICA agent Mr. McMenamin read from the BANK OF AMERICA computer system and quoted it as saying that Jeree called 12/6/07 at 8:12 a.m. when, in fact, the call was made in the evening (p.m.) by Jeri Priester.

51.     Mr. McMenamin said he would fax a current account status including statement balance, past due amounts, and more. He said the total balance due will be part of the information faxed.

52.     Mr. McMenamin said, "We are moving on to foreclosure proceedings against 28 Janice -" and that the "matter was turned over to [BANK OF AMERICA's] attorneys at First American"

53.     On or about March 24, 2008, Jeri Priester called from: (904) 464-6915 FLORIDA Her Dept.: Arm Real Estate Team. Unlike Brian McMenamin, Jeri acknowledged all past monthly payments and that Plaintiffs were up to date with their payments on the loan.

54.     On March 24, 2008, Jeri Priester said checks sent by Plaintiffs had all been cashed. She explained that Brian McMenamin was from another Department. Plaintiffs informed Ms. Priester of BANK OF AMERICA that Mr. McMenamin was supposed to send a fax but it was never received and that her letter which she promised to send and due months ago was also never received.

55.     On April 9, 2008 BANK OF AMERICA caused a facsimile to be transmitted to Plaintiffs attempting to collect a debt via facsimile using Borrower's fax line.

56.     BANK OF AMERICA failed to deliver all the "material" disclosures required by the Truth in Lending Act to Plaintiffs in connection with this transaction. In particular, BANK OF

AMERICA failed to provide material disclosures to Borrowers in the form of one copy of loan documents for each borrower; BANK OF AMERICA provided only one set of loan documents without any 'borrower copies.'

57.     BANK OF AMERICA's failure to deliver all the material disclosures required by the Truth in Lending Act to Plaintiffs in connection with the transaction violates 15 U.S.C. § 1638, entitling Plaintiffs to actual and statutory damages under 15 U.S.C. § 1640(a) and extending their right to rescind the transaction until up to three years after its consummation.

58.     BANK OF AMERICA's failure to take the action necessary and appropriate to reflect the termination of the security interest within 20 days after Plaintiffs' rescission of the transaction violates 15 U.S.C. § 1635(b) and entitles Plaintiffs to actual damages, statutory damages, and orders enforcing their rescission of the transaction.

59.     Despite Plaintiffs' numerous offers and attempts to tender amounts given by BANK OF AMERICA and to schedule said tender in accordance with the Truth in Lending Act, BANK OF AMERICA failed and refused to acknowledge or respond to such written communications. About one a year has passed and BANK OF AMERICA has yet to return to the Plaintiffs any money or property given by the Plaintiffs to anyone, including BANK OF AMERICA, as required by 15 U.S.C. § 1635(b) and Regulation Z, § 226.23(d)(2). The procedures prescribed by 15 U.S.C. § 1635 were never altered or amended by any order of court prior to the vesting of substantive rights.

## COUNT I

Truth in Lending Act
(Failure to Provide Disclosures)

60.     Plaintiffs repeat and reaver all of the averments contained in Paragraphs 1 through 152 hereof as if fully set forth herein.

61.     Plaintiffs are consumers within the meaning of the TILA. 15 U.S.C. § 1602(h).

62.     BANK OF AMERICA is a creditor within the meaning of the TILA in that they regularly extend or offer to extend consumer credit. 15 U.S.C. § 1602(f).

63.     The transaction between Plaintiffs and BANK OF AMERICA is subject to a finance charge or is payable by a written agreement in more than four installment payments. 15 U.S.C. § 1602(f).

64.     The credit extended to Plaintiffs by BANK OF AMERICA is for personal, family, or household purposes. 15 U.S.C. § 1602(h).

65.    BANK OF AMERICA failed to deliver all material disclosures required by the Truth in Lending Act and Regulation Z, in the following and other respects:

a. By failing to provide a correctly completed Notice of Right to Cancel as required under 15 U.S.C. § 1635(a) and Regulation Z § 226.23(b) in the following and other respects:.

i. Clearly and conspicuously disclosed how to exercise the right to rescind the transaction, with a form for that purpose, designating the address of BANK OF AMERICA's place of business; and

ii. Clearly and conspicuously disclosed the date the rescission period expired.

b. By failing to provide the required disclosures prior to consummation of the transaction in violation of 15 U.S.C. § 1638(b) and Regulation Z § 226.17(b).

c. By failing to make required disclosures clearly and conspicuously in writing in violation of 15 U.S.C. § 1632(a) and Regulation Z § 226.17(a).

66.    In the course of this consumer credit transaction, BANK OF AMERICA violated 15 U.S.C. § 1635(a) and Regulation Z § 226.23(b) by failing to deliver to the Plaintiffs two copies each of a notice of the right to rescind.

67.    Required disclosures concerning finance charges were never provided to the Co-Borrower.

68.    The disclosures improperly made by BANK OF AMERICA are material disclosures as defined in the Truth in Lending Act, 15 U.S.C. § 1602(u), Regulation Z, § 226.23 n. 48.

69.    By reason of these material violations of 15 U.S.C. § 1638, Plaintiff has a right of rescission for three years from the date of consummation of the loan pursuant to 15 U.S.C. § 1635(f).

70.    The finance charge and APR were underdisclosed by more than the tolerance levels set forth in 15 U.S.C. § 1605.

71.    By reason of the aforesaid violations of TILA and Regulation Z, defendant is liable to plaintiff in the amount of twice the finance charge, actual damages to be established at trial, and attorneys fees and costs in accordance with 15 U.S.C. § 1640.

72.    As part of this consumer credit transaction, BANK OF AMERICA retained a security interest in 28 Janice Lane, Hyannis, MA, which constituted Borrower's residence and a dwelling within the meaning of 15 U.S.C. § 1640(a)(2)(A)(iii).

73.     As a result of these violations of the TILA, BANK OF AMERICA is liable to Plaintiffs for actual damages pursuant to 15 U.S.C. § 1640(a)(1), statutory damages in the amount of $2000 in accordance with 15 U.S.C. § 1640(a)(2), and costs in accordance with 15 U.S.C. § 1640.

WHEREFORE, Plaintiffs request the following relief:

    A. Actual damages in an amount to be determined by the court;
    B. Statutory damages in the amount of twice the finance charges;
    C. Statutory damages in the amount of $2000;
    D. Costs; and
    E. Reasonable attorney fees.

## COUNT II

Truth in Lending Act
(Failure to Honor Rescission Notice)

74.     Plaintiffs repeat and reaver all of the averments contained in Paragraphs 1 through 152 hereof as if fully set forth herein.

75.     This consumer credit transaction was subject to Plaintiffs' right of rescission. 15 U.S.C. § 1635 and Regulation Z § 226.23. The procedures prescribed by 15 U.S.C. § 1635 were never altered or amended by any order of court prior to the vesting of substantive rights.

76.     Plaintiffs have a continuing right to rescind the transaction until the third business day after receiving all material disclosures, up to three years after consummation of the transaction, pursuant to 15 U.S.C. § 1635(a) and Regulation Z § 226.23(a)(3).

77.     On August 20, 2007, the Plaintiffs rescinded the transaction by sending to BANK OF AMERICA at 100 North Tryon Street, Charlotte, North Carolina 28255 (corporate headquarters as listed on the Mortgage) and at P.O. Box 21848, Greensboro, NC 27420-1848 (customer service address provided on billing statement), both by U.S. Mail, postage prepaid, certified mail, return receipt requested, a notice of rescission. (EXHIBIT B).

78.     On August 20, 2007, Co-Borrower exercised her right to cancel by signing the "Notice of Right to Cancel" she obtained by the Plaintiffs' own self-made copies of the single loan package sent by BANK OF AMERICA. Additionally, Co-Borrower included a letter offering to return all money and property given by BANK OF AMERICA. (EXHIBIT B).

79.     On or about August 26, 2007, Plaintiffs received the signed, return receipt from BANK OF AMERICA (corporate headquarters) for the cancellation notice. (EXHIBIT B).

80.     More than 20 calendar days have passed since BANK OF AMERICA received copies of the Plaintiffs' notice of rescission; it has been about a year.

81.     BANK OF AMERICA has failed to take any action necessary or appropriate to reflect the termination of any security interest created by the transaction, as required by 15 U.S.C. § 1635(b) and Regulation Z § 226.23(d)(2).

82.     BANK OF AMERICA has failed to return to the Plaintiffs any money or property given by the Plaintiffs to anyone, including BANK OF AMERICA, as required by 15 U.S.C. § 1635(b) and Regulation Z § 226.23(d)(2).

83.     As a result of the aforesaid violations of the Truth in Lending Act and Regulation Z, pursuant in part to 15 U.S.C. §§ 1635(a), 1640(a), and 1641(c), BANK OF AMERICA is liable to Plaintiffs for rescission of the transaction, termination of any security interest in Plaintiffs' property, statutory damages, actual damages such as damage to Plaintiffs' credit and other damages to be proven at trial, return of money given by plaintiffs, forfeiture of loan proceeds, costs and attorney fees.

WHEREFORE, Plaintiffs request the following relief:

    A.  Rescission of the transaction pursuant to 15 U.S.C. § 1635(b).

    B.  Termination of any security interest in Plaintiffs' property created by the transaction pursuant to 15 U.S.C. § 1635.

    C.  Return of any money or property given by the Plaintiffs to anyone, including the Defendant, in connection with this transaction, under 15 U.S.C. § 1635(b).

    D.  Statutory damages of $2,000 for the disclosure violations.

    E.  Statutory damages of $2,000 for Defendants' failure  to respond properly to Plaintiff's rescission notice pursuant to 15 U.S.C. § 1640(a)(2)(A).

    F.  Forfeiture of return of loan proceeds under 15 U.S.C. § 1635.

    G.  Actual damages in an amount to be determined pursuant to 15 U.S.C. § 1640.

    H.  Costs in accordance with 15 U.S.C. § 1640.

    I.  Reasonable attorney fees.

## COUNT III

### Violation of M.G.L. c. 140D

84.     Plaintiffs repeat and reaver all of the averments contained in Paragraphs 1 through 152 hereof as if fully set forth herein.

85.     Plaintiffs bring this cause of action against BANK OF AMERICA under M.G.L. c. 140D et seq., including, but not limited to, Sections 10 and 32.

86.     BANK OF AMERICA failed to provide all material disclosures required by M.G.L. c. 140D, Section 10(a), in the following and other respects:

        a. By failing to provide the information and rescission forms required under this section together with a statement containing the material disclosures required by said Chapter 140D.

        b. By failing to clearly and conspicuously disclose, in accordance with regulations of the commissioner as provided under said Chapter 140D, to either of the Plaintiffs their rights under this section.

        c. By failing to provide, in accordance with regulations of the commissioner, appropriate forms for the Plaintiffs to exercise their right to rescind any transaction subject to this section.

87.     BANK OF AMERICA further violated M.G.L. c. 140D by instituting a finance or other charge which is prohibited from beginning to accrue on any such transaction until the termination of the rescission period provided for in this section.

88.     BANK OF AMERICA failed to provide all material disclosures required by M.G.L. c. 140D, Section 10(b), in the following and other respects:

        a. By failing to honor or appropriately acknowledge Plaintiffs' exercise of their right to rescind under Subsection (a), in the following and other respects:

                i. By unlawfully holding Plaintiffs accountable or liable for any finance or other charges.

                ii. By unlawfully maintaining a security interest given by Plaintiffs after said interest had been rendered void by this section.

        b. By failing within twenty days after receipt of a notice of rescission, to return to the Plaintiffs any money or property given as earnest money, down payment, or otherwise.

        c. By failing to take any action necessary or appropriate to reflect the termination of any security interest created under the transaction.

d. By failing to honor Plaintiffs' rights to retain possession of any money or property given to Plaintiffs by BANK OF AMERICA, until such time as, or upon the performance of BANK OF AMERICA's obligations under this section.

e. By failing to cancel the outstanding loan obligations of Plaintiffs or to otherwise accept and acknowledge forfeiture of money or property given by BANK OF AMERICA to Plaintiffs after failing and refusing to take possession of the property within twenty days after tender by the Plaintiffs at the location of the property or at the residence of the Plaintiffs, at their option and as, in fact, directed by the Plaintiffs. (EXHIBIT B).

f. By failing to honor the property law of the Commonwealth which by operation thereof vested ownership of the loan proceeds in Plaintiffs names without further obligation on their part to pay for it.

89. The procedures prescribed by M.G.L. c. 140D, Section 10(b) were never altered or amended by any order of court.

90. This consumer credit transaction constituted a financing or refinancing with new and additional advances of the principal balance then due on the property secured.

91. As a result of the violation of Chapter 140D, including, but not limited to, Sections 10 and 32, BANK OF AMERICA is liable to the Plaintiffs in the sum of twice the amount of any finance charge in connection with the transaction as provided in Section 32.

WHEREFORE, Plaintiffs request the following relief:

A. Rescission of the transaction.

B. Termination of any security interest in Plaintiffs' property created by the transaction.

C. Return of any money or property given by the Plaintiffs to anyone, including the Defendant, in connection with this transaction.

D. Statutory damages of $2,000 for the disclosure violations.

E. Statutory damages equal to twice the finance charge in connection with this transaction for Defendant's failure to respond properly to the Plaintiffs' rescission notice.

F. Forfeiture of return of loan proceeds

G. Actual damages in an amount to be established at trial.

H. Costs and reasonable attorney fees.

I.   Award such other and further relief as the Court deems just and proper.

## COUNT IV

### Violation of M.G.L. c. 93A

92.   Plaintiffs repeat and reaver all of the averments contained in Paragraphs 1 through 152 hereof as if fully set forth herein.

93.   At all relevant times hereto BANK OF AMERICA was engaged in trade or commerce as a lender of consumer loan products, including but not limited to, residential real estate loans.

94.   BANK OF AMERICA committed acts or omissions which caused further damage to the Plaintiffs.

95.   Failure of BANK OF AMERICA to perform under the agreement as well as its acts or omissions caused substantial damage to the Plaintiffs.

96.   The acts and omissions of BANK OF AMERICA described herein or in attachments hereto, and in attempting to impose demonstrably unfair or unconscionable contract terms upon the Plaintiffs, asserting non-existent contract terms upon Plaintiffs, or imposing unenforceable contract terms against Plaintiffs or by improperly interpreting laws or ambiguous, contradictory or repugnant contract terms in its own favor, or by refusing to honor the contract in a fair and equitable manner, or by otherwise refusing to refund any portion of the overpayment of monies paid by Plaintiffs or monies subject to refunding, or by breaching and refusing to acknowledge or accept responsibility for the breach of its contractual or statutory obligations, or by denying that certain terms, events, communications or facts existed or occurred, or by attempting to conceal the existence of certain facts or property (e.g. photographs), being dishonest with Plaintiffs and attempting to mislead Plaintiffs with respect to various business matters, handling a legitimate business dispute in bad-faith, avoiding communication or contact from Plaintiffs, all constitute acts or practices declared to be unfair, deceptive and unlawful within the meaning of M.G.L. c. 93A, §§ 2, 9 and 11.

97.   The actions of BANK OF AMERICA described herein were performed willfully and knowingly.

98.   As a result of the above described unfair or deceptive acts or practices, Plaintiffs sustained injury including, but not limited to, decreased market value of their property, nuisance, strained and/or loss of resources, opportunity losses, marketing and advertising losses, damage to profitability in part, and further expenses incurred to enforce its rights to compensation, a return of property and money, and the loss of the value of money over time.

WHEREFORE, the Plaintiffs, request this court to;

- A.  enter judgment for Plaintiffs against defendant;
- B.  award damages to Plaintiffs in an amount determined by the court;
- C.  treble such amount as provided by M.G.L. c. 93A, § 9(3);
- D.  award interest, costs, and attorney fees to Plaintiffs; and
- E.  award such other relief as this court deems just and proper.

## COUNT V

### Breach of Contract

99.    Plaintiffs repeat and reaver all of the averments contained in Paragraphs 1 through 152 hereof as if fully set forth herein.

100.    BANK OF AMERICA breached the implied obligation of good faith under the agreement with Plaintiff.

101.    BANK OF AMERICA breached the implied covenant that neither party shall do anything which will destroy or injure the other party's right to receive the fruits of the contract.

102.    BANK OF AMERICA refused to honor their agreement in a fair and equitable manner with the Plaintiff.

WHEREFORE, the Plaintiffs request this court to;

- A.  enter judgment for Plaintiffs against defendant;
- B.  award damages to Plaintiffs in an amount determined by the court;
- C.  award interest, costs, and attorney fees to Plaintiffs; and
- D.  award such other relief as this court deems just and proper.

## COUNT VI

### Intentional/Negligent Infliction of Emotional Distress

103.    Plaintiffs repeat and reaver all of the averments contained in Paragraphs 1 through 152 hereof as if fully set forth herein.

104.    BANK OF AMERICA's actions were willful, wanton, oppressive, malicious, outrageous, reckless, abusive and otherwise morally culpable and support exemplary damages.

105.    Plaintiffs would show that BANK OF AMERICA desired to cause the foreclosure of and for Plaintiffs to lose their home.

106.    Plaintiffs would show that BANK OF AMERICA desired to cause negative reporting to the credit rating of Plaintiffs' excellent credit rating and for Plaintiffs to lose valuable credit opportunities.

107.    Plaintiffs would show that BANK OF AMERICA desired to cause a voided lien on their home to remain, and failed and refused to take actions necessary to reflect or prove the voided nature of the lien, and for Plaintiffs to lose valuable opportunities to sell their home in advance of a declining market and to lose valuable equity in the home.

108.    BANK OF AMERICA believe that the consequences of their actions were substantially certain to result in Plaintiffs losing their home, increase the likelihood of Plaintiffs losing their home, cause distress, harassment and embarrassment to Plaintiffs, damage Plaintiffs' excellent credit rating and cause Plaintiffs to lose valuable credit opportunities, and result in Plaintiffs loss of opportunities to sell their home in advance of a declining market, and to lose valuable equity in the home.

109.    BANK OF AMERICA's conduct was reckless in that BANK OF AMERICA should have known that there was a high degree of risk or harm that Plaintiffs would suffer by the credible threat of their losing their home and suffer damages.

110.    BANK OF AMERICA's conduct was reckless in that BANK OF AMERICA should have known that there was a high degree of risk or harm that Plaintiffs would suffer by the credible threat of their losing their home and suffer damages.

111.    BANK OF AMERICA by the actions and omissions described herein breached its fiduciary duties and position of trust to Plaintiffs.

112.    When engaging in the conduct described herein, BANK OF AMERICA intended to inflict emotional distress, or negligently inflicted emotional distress upon the Plaintiffs, or knew or should have known that emotional distress was the likely result of its conduct.

113.    BANK OF AMERICA's conduct was extreme and outrageous, beyond all possible bounds of decency and utterly intolerable in civilized community.

114.    Actions of BANK OF AMERICA were the proximate and actual cause of Plaintiffs' distress

115.    Emotional distress suffered by Plaintiffs was severe and of such a nature that no reasonable person could be expected to endure it.

116.    The conduct of BANK OF AMERICA caused emotional distress to Plaintiffs, which resulted in physical symptoms to Plaintiffs; Borrower suffered neck, back and leg soreness and stiffness, aggravated neck, back, and leg pain which restricted movement, and Co-Borrower

suffered sleepless nights and loss of appetite and ability to function normally and to work at her job comfortably.

117.    The actions of BANK OF AMERICA caused Borrower to be turned down for credit, embarrassment by the foreclosure threat, damage to credit record reported by BANK OF AMERICA, and caused Plaintiffs to lose equity in their home as described herein. The Plaintiffs have suffered embarrassment, fear, humiliation, and worry for a year because of the unreasonable actions of BANK OF AMERICA.

118.    Given that the conduct of BANK OF AMERICA was intentional and/or done with a reckless disregard for the welfare of the Plaintiffs, Plaintiffs are entitled to punitive damages; BANK OF AMERICA's actions were willful, wanton, oppressive, malicious, outrageous, reckless and abusive so as to entitle the plaintiffs to punitive or exemplary damages in an amount to be determined at trial.

WHEREFORE, the Plaintiffs request this court to;

        A.      enter judgment for Plaintiffs against defendant;
        B.      award damages to Plaintiffs in an amount determined by the court;
        C.      award punitive damages to Plaintiffs in an amount determined at trial;
        D.      award interest, costs, and attorney fees to Plaintiffs; and
        E.      award such other relief as this court deems just and proper.

## COUNT VII

### Breach of Fiduciary Duty

119.    Plaintiffs repeat and reaver all of the averments contained in Paragraphs 1 through 152 hereof as if fully set forth herein.

120.    BANK OF AMERICA had a duty to honor its agreements, banking, credit and collection laws with Plaintiffs, and to refrain from causing harm or damage and acting contrary to law given its special position of trust to Plaintiffs as a federally insured and regulated financial institution.

121.    BANK OF AMERICA had a duty to make appropriate disclosures and to acknowledge and process Plaintiffs cancellation of the loan, especially prior to taking negative action against Plaintiffs, and a duty to return money or property given by Plaintiffs, among other duties.

122.    BANK OF AMERICA breached its fiduciary duties owed to Plaintiffs.

WHEREFORE, the Plaintiffs request this court to;

        A.      enter judgment for Plaintiffs against defendant;

B.   award damages to Plaintiffs in an amount determined by the court;
C.   award interest, costs, and attorney fees to Plaintiffs; and
D.   award such other relief as this court deems just and proper.

## COUNT VIII

### Negligence

123.   Plaintiffs repeat and reaver all of the averments contained in Paragraphs 1 through 152 hereof as if fully set forth herein.

124   Plaintiffs would show that BANK OF AMERICA occupied a position of trust as to Plaintiffs, whether as Trustee or as holder of the Note secured by the Mortgage or otherwise.

125.   BANK OF AMERICA had a duty to properly oversee and supervise the actions of its agents and employees.

126.   BANK OF AMERICA had a duty to make required disclosures, follow required procedures, maintain consistent communications both internally and externally, and to refrain from taking negative action against Plaintiffs as described herein.

127.   BANK OF AMERICA breached the duties described herein.

128.   BANK OF AMERICA's actions and omissions were the proximate and actual cause of Plaintiffs' damages.


WHEREFORE, the Plaintiffs request this court to;

> enter judgment for Plaintiffs against Defendants;
> award damages to Plaintiffs in an amount determined by the court;
> award treble damages to Plaintiffs pursuant to M.G.L. c. 93A and other applicable laws;
> award interest, costs, and attorney fees to Plaintiffs;
> award punitive damages to Plaintiffs; and
> award such other relief as this court deems just and proper.


## COUNT IX

### Violations of the Fair Debt Collection Practices Act.

129.   Plaintiffs repeat and reaver all of the averments contained in Paragraphs 1 through 152 hereof as if fully set forth herein.

130.   Plaintiffs would show that BANK OF AMERICA's actions also violated the Federal Fair Debt Collection Practices Act.

131.   BANK OF AMERICA's actions in failing properly to account for payments made, failing properly to provide accurate and up-to-date account information, failing to verify the debt on the request of Plaintiffs, posting default status and falsely reporting negative credit information to three major credit scoring bureaus when Plaintiffs were trying to communicate, clarify and resolve the misunderstandings and misdeeds, pay off amounts and debts in dispute under protest in order to maintain the status quo and provide additional time for BANK OF AMERICA to change its course and cure its unlawful actions, giving inconsistent accounting information on the amount of the debt, payment history, and generally failing to cooperate in allowing Plaintiffs to remedy the situation and protect their credit, contacting Plaintiffs at home and at work at all hours of the day and evening, contacting Plaintiffs at their cell phone number and fax line, constitute unreasonable debt collection practices.

132.   As a result of these practices, Plaintiffs suffered the fear and distress of possibly losing their home to an improper foreclosure, loss of credit to false and unwarranted credit reporting, and loss of equity in their home due to uncertainties over the status and fate of the home loan account and mortgage.

133.   As a result of these practices, Plaintiffs suffered physical symptoms.

134.   BANK OF AMERICA's conduct was intentional or reckless and was extreme and outrageous, thereby causing Plaintiffs severe emotional distress.

135.   Plaintiffs seek damages for their physical injuries and medical expenses, as well as their mental anguish and the loss of the equity in their property.

136.   Plaintiffs further seek exemplary damages and attorneys' fees.


WHEREFORE, the Plaintiffs request this court to;

>   enter judgment for Plaintiffs against Defendants;
>   award damages to Plaintiffs in an amount determined by the court;
>   award treble damages to Plaintiffs pursuant to M.G.L. c. 93A and other applicable laws;
>   award interest, costs, and attorney fees to Plaintiffs;
>   award punitive damages to Plaintiffs; and
>   award such other relief as this court deems just and proper.


## COUNT X

### Unreasonable Debt Collection Practices

137. Plaintiffs repeat and reaver all of the averments contained in Paragraphs 1 through 152 hereof as if fully set forth herein.

WHEREFORE, the Plaintiffs request this court to;

    enter judgment for Plaintiffs against Defendants;
    award damages to Plaintiffs in an amount determined by the court;
    award treble damages to Plaintiffs pursuant to M.G.L. c. 93A and other applicable laws;
    award interest, costs, and attorney fees to Plaintiffs;
    award punitive damages to Plaintiffs; and
    award such other relief as this court deems just and proper.

## COUNT XI

### Violations of the Massachusetts Debt Collection Practices Act

138. Plaintiffs repeat and reaver all of the averments contained in Paragraphs 1 through 152 hereof as if fully set forth herein.

139. BANK OF AMERICA is a debt collector for purposes of the Massachusetts and Federal Fair Debt Collection Practices Act.

140. Plaintiffs would show that BANK OF AMERICA failed to respond in a timely manner to an these and other related allegations of the Plaintiffs' in written letters and phone conversations as described herein that the debt was incorrect in accordance with law.

141. BANK OF AMERICA also used unfair or unconscionable means, such as threatening and causing harm to Plaintiffs' credit, by collecting or attempting to collect interest or a charged fee or expense incidental to the allegation that was not authorized by the terms of the parties' contract, in violation of law.

142. BANK OF AMERICA also failed to disclose clearly in communications with Plaintiffs the name of the person to whom the debt has been assigned or owed when making a demand for money, in violation of law.

143. BANK OF AMERICA's violation of applicable debt collection laws entitles Plaintiffs to injunctive relief and actual damages and attorneys' fees.

WHEREFORE, the Plaintiffs request this court to;

    enter judgment for Plaintiffs against Defendants;
    award damages to Plaintiffs in an amount determined by the court;
    award treble damages to Plaintiffs pursuant to M.G.L. c. 93A and other applicable laws;
    award interest, costs, and attorney fees to Plaintiffs;

award punitive damages to Plaintiffs; and
award such other relief as this court deems just and proper.

## COUNT XII

### Money Had and Received

144.   Plaintiffs repeat and reaver all of the averments contained in Paragraphs 1 through 152 hereof *as if fully set forth herein.*

145.   BANK OF AMERICA owes Plaintiffs the dollar value of unearned, improperly expended, or unlawfully withheld or collected monies or property acquired from, or advanced by Plaintiffs to BANK OF AMERICA for money had and received from Plaintiffs in the form of loan payments and payments under protest, to be used by BANK OF AMERICA or returned to Plaintiffs in the event of breach, overpayment, surplus, and/or unauthorized or illegal expenditures, collections, demands, actions or admissions or both.

WHEREFORE, the Plaintiffs request this court to;

enter judgment for Plaintiffs against Defendant;
award damages to Plaintiffs in an amount determined by the court;
award interest, costs, and attorney fees to Plaintiffs; and
award such other relief as this court deems just and proper.

## COUNT XIII

### Temporary Restraining Order and Injunctive Relief

146.   Plaintiffs repeat and reaver all of the averments contained in Paragraphs 1 through 152 hereof *as if fully set forth herein.*

147.   Plaintiffs further seek a Temporary Restraining Order, Temporary Injunction, and a Permanent Injunction to enjoin and restrain BANK OF AMERICA, their agents, servants, employees, representatives, or attorneys from the following:

   (a)  issuing a notice of acceleration, notice of intent to foreclose, notice of

        foreclosure; notice posting of foreclosure, or otherwise taking actions

        designed to accomplish a foreclosure;

   (b)  attempting to or actually taking possession of the Property, which is located

at 28 Janice Lane, Hyannis, MA;

(c) interfering in any way with Plaintiffs' possession or Plaintiffs' tenants' possession of the Property;

(d) taking any action whatsoever to collect a debt from the Plaintiffs;

(e) taking any action whatsoever to report the alleged debt of the Plaintiffs to Defendants or any one of them to a credit reporting agency or other credit bureau or other person or entity; and

(f) from taking any action whatsoever that may be construed as unreasonable debt collection or otherwise violating the Mass or federal statutes regarding debt collection.

### Temporary Injunction

149. Plaintiffs repeat and reaver all of the averments contained in Paragraphs 1 through 152 hereof as if fully set forth herein.

150. Plaintiffs seek a Temporary Injunction enjoining and restraining Defendants, their agents, employees, and attorneys from taking any other action against Plaintiffs connected with the subject matter of this suit during the pendency of this suit.

### Permanent Injunction

151. Plaintiffs repeat and reaver all of the averments contained in Paragraphs 1 through 152 hereof as if fully set forth herein.

152. Plaintiffs seek a permanent injunction enjoining and restraining Defendants, their agents, employees, and attorneys from attempting to collect a debt, harass, foreclose, or take any other action against Plaintiffs connected with the subject matter of this suit.

## DAMAGES

As a result of the Defendants' actions and omissions, the Plaintiffs have suffered monetary damages as set forth herein.

The Defendants' actions were willful, wanton, oppressive, malicious, outrageous, reckless and abusive so as to entitle the plaintiffs to punitive or exemplary damages in an amount to be determined at trial.

The Plaintiffs are also entitled to treble damages and to the costs of this action, including reasonable attorney fees pursuant to M.G.L. c. 93A, and other applicable sources of law.

WHEREFORE, the Plaintiffs claim and respectfully pray that this Court;

1. Enter judgment in the amount of actual damages proven as against the Defendant;

2. Award interest, attorney's fees and costs as awardable under applicable law;

3. Grant compensatory damages in an amount to be determined at trial, for the loss of equity and economic opportunity, and award treble damages under M.G.L. c. 93A and other applicable law;

4. Grant compensatory damages in an amount to be determined at trial, for the incidental and consequential damages suffered by Plaintiffs as a result of Defendant's conduct;

5. Grant compensatory damages in an amount to be determined at trial, for the personal injuries suffered by Plaintiffs as a result of Defendant's tortious acts and omissions;

6. Enter judgment for Plaintiff in the amount of statutory damages proven at trial for multiple statutory violations of the Defendant, including, but not limited to TILA, Regulation Z, and the Fair Debt Collections Act;

   *pursuant to 15 U.S.C. §§ 1635(a), 1639(j), 1640(a), and M.G.L. c. 140D and/or c. 93A:*

7. Rescission of the transaction, including a declaration that the Plaintiffs are not liable for any finance charges or other charges imposed by Defendant;

8 A declaration that the security interest in Plaintiffs' property created under the transaction is void, and an order requiring Defendants to release such security interest;

9 Return of any money or property given by the Plaintiffs to anyone, including the Defendant, in connection with the transaction;

10 Statutory damages consisting of $2,000 for the disclosure violation, $2,000 for the failure to rescind, and $2,000 for each additional violation or other non-disclosure violation proven at trial (and/or alternatively, as provided for under M.G.L. c. 93A);

11. Additional damages pursuant to 15 U.S.C. § 1640(a)(4) in the amount of all finance charges and fees paid by Plaintiffs, for each non-disclosure violation;

12.    An order that, because Defendants failed to act in response to Plaintiff's notice of rescission, Plaintiffs have no duty to tender the loan proceeds to Defendants, but in the alternative, if tender is required, a determination of the amount of the tender obligation in light of all of the Plaintiff's claims, and an order requiring the Defendant to accept tender on reasonable terms and over a reasonable period of time;

13.    Grant punitive damages in an amount to be determined at trial;

14.    Order such equitable relief as is requested in Count XIII, hereinabove; and

15.    Such other and further relief at law or equity as this Court may deem just and proper.


### THE PLAINTIFFS DEMAND TRIAL BY JURY
### AS TO ALL ISSUES RAISED BY THE COMPLAINT


                          The Plaintiffs
                          Brian Wasser & Susan Quealy-Wasser,
                          By their attorney,



Date:   August 18, 2008

                          Brian J. Wasser, BBO #633621
                          Law Offices of Brian J. Wasser,
                          P.O. Box 1978
                          Hyannis, MA 02601
                          (978) 862-9999

# EXHIBIT A



# CLOSING INSTRUCTIONS

TO:   Borrower and Notary (**PLEASE BE SURE NOTARY READS THIS NOTICE BEFORE EXECUTION OF ANY DOCUMENT)**

FROM:  FISERV Lending Solutions, Title Agent for Bank of America

DATE:   August 2, 2007

RE:    Brian J Wasser

As discussed in our recent phone conversation, attached are documents for re-execution.
**These documents must be executed in the presence of a Notary Public within 10 days of receipt.**

1.) Borrower(s) must sign **EXACTLY** as their name appear(s) typed on the signature page/document.
2.) If State Regulation requires witness signature(s), the name of each witness must be printed clearly underneath the signature. This document requires (1) Notary2 witness signatures.
3.) Notaries must not stamp/seal the document over any print or type on the form.
4.) The Notary stamp/seal must be clear and legible. If it appears blurred at all, please stamp/seal again.
5.) Please be sure that the Notary's Commission Expiration date is included.
6.) Please be sure all areas of acknowledgement are completed properly.
7.) A postage-paid return envelope is provided for your convenience. Please return the fully executed documents in this envelope immediately upon execution. **If you are bringing the documents to a bank branch for a bank representative to notarize; please note, they still <u>must be returned in this envelope</u> and not through bank interoffice systems.**

IF YOU SHOULD HAVE ANY QUESTIONS OR PROBLEMS, PLEASE CALL
Dearra Milner AT **1-800-842-8423**, Extension. 1172

Thank you.

Record and Return To:
Fiserv Lending Solutions
27 Inwood Road
ROCKY HILL, CT 06167

Wasser, Brian

Loan Number: 68871801310199

Property Address: 28 JANICE LN
HYANNIS, MASSACHUSETTS 02601-4432

————————————————— [Space Above This Line For Recording Data] —————————————————

# OPEN-END MORTGAGE

## DEFINITIONS

**(A)** **"Security Instrument"** means this document, which is dated JANUARY 17, 2007 , together with all Riders to this document.

**(B)** **"Borrower"** is BRIAN J WASSER AND SUSAN QUEALY-WASSER

the party or parties who have signed this Security Instrument.
Borrower is the Mortgagor under this Security Instrument.

**(C)** **"Lender"** is Bank of America, NA

Lender is a National Banking Association organized and existing under the laws of THE UNITED STATES OF AMERICA
Lender's address is 100 North Tryon Street, Charlotte, North Carolina 28255

Lender is the Mortgagee under this Security Instrument.

**(D)** **"Agreement"** means the Home Equity Line of Credit Agreement signed by the Borrowers.

**(E)** **"Account"** means the Home Equity Line of Credit Account pursuant to which the Lender makes Advances to the Borrower at the Borrower's direction, allowing the Borrower to repay those Advances and take additional Advances, subject to the terms of the Agreement.

**(F)** **"Credit Limit"** means the maximum aggregate amount of principal that may be secured by this Security Instrument at any one time. The Credit Limit is $90,000.00 . Except to the extent prohibited by Applicable Law, the Credit Limit does not apply to interest, Finance Charges, and other fees and charges validly incurred by Borrower under the Agreement and this Security Instrument. The Credit Limit also does not apply to other advances made under the terms of this Security Instrument to protect Lender's security and to perform any of the covenants contained in this Security Instrument.

**(G)** **"Account Balance"** is the total unpaid principal of the Account, plus earned but unpaid Finance Charges, outstanding fees, charges, and costs.

**(H)** **"Maturity Date"** is the date on which the entire Account Balance under the Agreement is due. The entire Account Balance on your Account, as defined in the Agreement and this Security Instrument, is due on JANUARY 17, 2032 .

BRIAN WASSER/995070111529050

MASSACHUSETTS HOME EQUITY LINE OF CREDIT MORTGAGE
MAHESI.HLC 10/06/06                    Page 1 of 13                    DocMagic *eFRrms* 800-649-1362
www.docmagic.com

(I)  "Property" means the Property that is described below under the heading "Transfer of Rights in the Property."
(J)  "Secured Debt" means:
    (1)  All amounts due under your Account, including principal, interest, Finance Charges, and other fees, charges, and costs incurred under the terms of this Security Instrument and all extensions, modifications, substitutions or renewals thereof.
    (2)  Any advances made and expenses incurred by Lender under the terms of this Security Instrument.
(K)  "Riders" means all Riders to this Security Instrument that are executed by Borrower.  The following Riders are to be executed by Borrower [check box as applicable]:

☐ 1-4 Family      ☐ Condominium Rider      ☐ Escrow Rider
☐ Second Home      ☐ Planned Unit Development Rider      ☐ Mortgage Insurance Rider
☐ Other(s)

(L)  "Applicable Law" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.
(M)  "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.
(N)  "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account.  Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.
(O)  "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for:  (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.
(P)  "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Agreement and/or this Security Instrument.
(Q)  "Approved Prior Loan" means a lien which is and which lender acknowledges and agrees will continue to have priority over the lien created by this Security Instrument.

## TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender:  (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note.  For this purpose, Borrower does hereby mortgage, grant and convey to Lender and Lender's successors and assigns, with power of sale, the following described property located in the

        COUNTY          of          BARNSTABLE          :
    [Type of Recording Jurisdiction]                    [Name of Recording Jurisdiction]

MASSACHUSETTS HOME EQUITY LINE OF CREDIT MORTGAGE
MAHESI.HLC  10/06/06                 Page 2 of 13          DocMagic ℰℱⓇⓄⓄ⑦⑦⑧⑧ 800-649-1362
                                                                          www.docmagic.com

SCHEDULE A ATTACHED HERETO AND MADE A PART OF.

which currently has the address of   28 JANICE LN

[Street]

HYANNIS             MASSACHUSETTS            026014432        ("Property Address"):

[City]                    [State]                         [Zip Code]

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

ADVANCES. During the Draw Period described in the Agreement, the Borrower may repeatedly take and repay any advances that Lender makes to Borrower under the terms of the Agreement and this Security Instrument, subject to the terms that the Agreement and this Security Instrument impose. The Agreement and this Security Instrument will remain in full force and effect notwithstanding that the Account Balance under the Agreement may occasionally be reduced to an amount of equal to or less than zero.

Any amounts that Lender advances to Borrower in excess of the Credit Limit will be secured by the terms of this Security Instrument unless applicable law prohibits the same. Lender shall not be obligated to increase the Credit Limit formally or to make additional Advances in excess of the Credit Limit stated in the Agreement even though the Credit Limit has been exceeded one or more times. The Draw Period may or may not be followed by a Repayment Period, as described in the Agreement, during which additional Advances are not available. During both the Draw Period and the Repayment Period the Lender may, at its option, make Advances from the Account to pay fees, charges, or credit insurance premiums due under the Agreement or this Security Instrument, or make other Advances as allowed by this Security Instrument.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

**UNIFORM COVENANTS.**     Borrower and Lender covenant and agree as follows:

1.   **Payment of Secured Debt.** Borrower shall pay when due all Secured Debt in accordance with the Agreement and this Security Instrument. All payments shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Agreement or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Agreement or Security Instrument be by a method of Lender's choosing. These methods include, but are not limited to:  (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Billing Statement or at such other location as may be designated by Lender in accordance with the notice provisions provided in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring

the Account current. Lender may accept any payment or partial payment insufficient to bring the Account current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Agreement and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2.   **Application of Payments or Proceeds.** All payments accepted by Lender shall be applied to the Secured Debt under this Security Instrument as provided in the Agreement unless Applicable Law provides otherwise. Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Agreement shall not extend or postpone the due date, or change the amount, of the Minimum Payment.

3.   **Funds for Escrow Items.** Borrower shall not be required to pay into escrow amounts due for taxes, assessments, leasehold payments, or other insurance premiums unless otherwise agreed in a separate writing.

4.   **Charges; Liens; Prior Security Interests.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in a manner provided in Section 3.

Borrower shall promptly discharge any lien, other than the Approved Prior Loan, which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, other than the Approved Prior Loan, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth in this Section.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with the Agreement. Borrower shall pay when due, or shall cause to be paid when due, all sums required under the loan documents evidencing the Approved Prior Loan and shall perform or cause to be performed all of the covenants and agreements of Borrower or the obligor set forth in such loan documents. All of Lender's rights under this Covenant shall be subject to the rights of the Holder of the Approved Prior Loan.

5.   **Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Agreement. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed

by Lender under this Section shall become additional Secured Debt of Borrower and secured by this Security Instrument. These amounts shall be subject to the terms of the Agreement and the Security Instrument.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgagee clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgagee clause and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Agreement up to the amount of the outstanding Agreement Account Balance.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower.  Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the Secured Debt secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.  Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters.  If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim.  The 30-day period will begin when the notice is given.  In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Agreement or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Agreement or this Security Instrument, whether or not then due.

6.     **Occupancy.**  Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of the Agreement and Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one  year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7.     **Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property.  Whether or not Borrower resides on the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage.  If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed.  If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

BRIAN WASSER/995070111529050
MASSACHUSETTS HOME EQUITY LINE OF CREDIT MORTGAGE
MAHESI.HLC  10/06/06                                          Page 5 of 13                    DocMagic *eFarms* 800-849-1362
                                                                                             www.docmagic.com

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8. **Borrower's Home Equity Line of Credit ApplicationProcess; Default.** Borrower shall be in default if, during the Account application process, or at any time during the term of the Agreement, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Account. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

Borrower is also in default if: 1) Borrower engages in fraud or makes a material misrepresentation at any time in connection with Borrower's Account; 2) Lender does not receive the full amount of any Minimum Payment due or Borrower fails to meet any of the other repayment terms of the Agreement; 3) Borrower's action or inaction adversely affects the Property or Lender's rights in it. Examples of these actions or inactions include, but are not limited to: a) Borrower's's death, if Borrower is the sole person on the Account; or the death of all but one borrower which adversely affects Lender's security; b) Illegal use of the Property, if such use subjects the Property to seizure; c) Transfer of all or part of the Borrower's interest in the Property without Lender's written consent; d) All or part of the Property is taken by condemnation or eminent domain; e) Foreclosure of any senior lien on the Property; f) Failure to maintain required insurance on the Property; g) Waste or destructive use of the Property which adversely affects Lender's security; h) Failure to pay taxes or assessments on the Property; i) Permitting the creation of a senior lien on the Property other than an Approved Prior Loan; j) Filing of a judgment against Borrower, if the amount of the judgment and collateral subject to the judgment is such that Lender's security is adversely affected.

Lender may, at its option, take lesser actions than those described at the beginning of this Section. Such lesser actions may include, without limitation, suspending Borrower's Account and not allowing Borrower to obtain any further Advances, reducing Borrower's Credit Limit, and/or changing the payment terms on Borrower's Account. If Lender takes any such actions, this shall not constitute an election of remedies or a waiver of Lender's right to exercise any rights or remedies under the remainder of this Section, the remaining provisions of the Agreement, the Security Instrument, or at law or in equity. Lender may take action under this Section only after complying with any notice or cure provisions required under Applicable Law. In the event Lender elects not to terminate the Account or take any lesser action as provided in this Section, Lender does not forfeit or waive its right to do so at a later time if any of the circumstances described above exists at that time.

9. **Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any Secured Debt secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Lender may without notice, perform or cause to be performed any covenant of Borrower in this Security Instrument, and Borrower appoints Lender as attorney in fact to sign Borrower's name. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take this action, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section.

Any amounts disbursed by Lender under this Section shall become additional Secured Debt of Borrower secured by this Security Instrument, payable according to the terms of the Agreement and this Security Instrument. These

amounts shall bear interest at the Agreement rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment. If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. Borrower shall not surrender the leasehold estate and interests herein conveyed or terminate or cancel the ground lease. Borrower shall not, without the express written consent of Lender, alter or amend the ground lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

    **10.   Mortgage Insurance.** Borrower is not required to obtain Mortgage Insurance unless otherwise agreed in writing.

    **11.   Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the Secured Debt secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in the Agreement and this Security Instrument.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the Secured Debt secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in  value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the Secured Debt secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Secured Debt secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the Secured Debt immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in  value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value  of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the Secured Debt immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the Secured Debt secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, and Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or  to the Secured Debt secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's  interest in the Property or

rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be otherwise applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the Secured Debt secured by this Security Instrument granted by Lender to Borrower or any Successors in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Agreement (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the Secured Debt secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Agreement without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind and benefit the successors and assigns of Lender.

**14. Agreement/Account Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Account is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other Account charges collected or to be collected in connection with the Account exceed the permitted limits, then: (a) any such Account charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Agreement or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Agreement). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's

BRIAN WASSER/995070111529050
MASSACHUSETTS HOME EQUITY LINE OF CREDIT MORTGAGE
MAHESI.HLC 10/06/06                              Page 8 of 13                              DocMagic *eForms* 800-649-1362
                                                                                                    www.docmagic.com

address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

16. **Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Agreement conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Agreement which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

17. **Borrower's Copy.** Borrower shall be given one copy of the Agreement and of this Security Instrument.

18. **Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

19. **Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender or causes Lender to be paid all sums which then would be due under this Security Instrument and the Agreement as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the Secured Debt secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

20. **Change of Servicer; Notice of Grievance.** The Agreement or a partial interest in the Agreement (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Servicer") that collects the amounts due under the Agreement and this Security Instrument and performs other mortgage loan servicing obligations under the Agreement, this Security Instrument,

and Applicable Law. There also might be one or more changes of the Servicer unrelated to a sale of the Agreement. If the Agreement is sold and thereafter the Agreement is serviced by a Servicer other than the purchaser of the Agreement, the servicing obligations to Borrower will remain with the Servicer or be transferred to a successor Servicer and are not assumed by the Agreement purchaser unless otherwise provided.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party and allowed the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and reasonable time to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

**NON-UNIFORM COVENANTS.** Borrower and Lender further covenant and agree as follows:

**22. Acceleration;Remedies. Lender shall give notice as required by Applicable Law prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument or the Agreement (but not prior to acceleration under Section 18 of the Security Instrument unless Applicable Law provides otherwise), Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section, including, but not limited to, reasonable attorneys' fees and costs of title evidence.**

**If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold Trustee shall**

cause this notice to be recorded in each county in which any art of the Property is located. Lender or Trustee shall mail copies of he notice as prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

23. **Release.** Upon Borrower's request, and upon payment in full of all sums secured by this Security Instrument, Lender shall discharge this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

24. **Waivers.** Borrower waives all rights of homestead exemption in the Property and relinquishes all rights of curtesy and dower in the Property.

25. **Open-End Mortgage.** This Security Instruments secures repayment of sums lent by Lender to Borrower from time to time pursuant to an "open-end credit plan" as defined in Section 1 of Chapter 140D of the General Laws of Massachusetts.

[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]



MORTGAGEE REQUESTS NOTICE OF ANY ADVERSE ACTION
THAT A PRIORITY LIEN HOLDER TAKES WITH REGARD TO
THE PROPERTY, INCLUDING DEFAULT AND FORECLOSURE

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security
Instrument and in any Rider executed by Borrower and recorded with it.

_____ (Seal)          _____ (Seal)
BRIAN J WASSER                        -Borrower          SUSAN QUEALY-WASSER              -Borrower

_____ (Seal)          _____ (Seal)
                                      -Borrower                                          -Borrower

_____ (Seal)          _____ (Seal)
                                      -Borrower                                          -Borrower

Witness:                                         Witness:

_____                 _____

BRIAN  WASSER/995070111529050
MASSACHUSETTS HOME EQUITY LINE OF CREDIT MORTGAGE
MAHESI.HLC  10/06/06                     Page 12 of 13                    DocMagic ⓔⒻⓞⓡⓜⓢ 800-649-1362
                                                                         www.docmagic.com

[Space Below This Line For Acknowledgment]

Commonwealth of Massachusetts

County of _Barnstable_

On this _18th_ day of _August 2007_ before me, the undersigned notary public,

personally appeared BRIAN J WASSER AND SUSAN QUEALY-WASSER

proved to me through satisfactory evidence of identification, which were _Massachusetts_
_Driver's License_,

to be the person whose name is signed on the preceding or attached document, and acknowledged to me that (he) (she)
signed it voluntarily for its stated purpose.

☐ (as partner for _____
   a corporation)

☐ (as _____ for _____
                                                    , a corporation)

☐ (as attorney in fact for _____
   the principal)

☑ (as _themselves_ for _themselves_
   _____ )                    , (a) (the)

_(signature)_
Notary Public

_Emily A Baldwin_
Notary Public (Printed Name)

My commission expires: _9/13/2007_

(Seal)

 **Bank of America**

**Open-End Credit Account
Notice of Right to Cancel-
Statement of Cancellation**

Bank Id# 995070111529050      Service Id# 68871801310199

**1. Your Right To Cancel**
We have agreed to establish an open-end credit account for you, and have agreed to give us a deed of trust, mortgage, or similar lien on your home as security for your account. You have a legal right to cancel the account without cost, within three business days after the latest of the following events:

(a) the date you sign the Account Agreement for the line of credit secured by property located at

\* 28 JANICE LANE
    HYANNIS, MA 02601
_____ ; or

(b) the date you received your Truth-in-Lending disclosures; or
(c) the date you received this notice of your right to cancel the account.

If you cancel the account, the deed of trust, mortgage, or similar lien on your home is also canceled. Within 20 calendar days after we receive your notice of cancellation, we must take the necessary steps to reflect the fact that the deed trust, mortgage or similar lien on your home has been canceled. We must also return to you any money or property you have given to us or to anyone else in connection with the account.

You may keep any money or property we have given you until we have done the things mentioned above, but you must then offer to return the money or property. If it is impractical or unfair for you to return the property, you must offer its reasonable value. You may offer to return the property. Money must be returned to the address shown in Section 2 (How to Cancel). If we do not take possession of the money or property within 20 calendar days of your offer, you may keep it without further obligation.

**2. How to Cancel**
If you decide to cancel the account, you may do so by notifying us in writing, at BANK OF AMERICA, N.A.

_____
_____
_____

You may use any written statement that is signed and dated by you and states your intention to cancel, or you may use this notice by dating and signing below. Keep one copy of this notice because it contains important information about your rights.

If you cancel by mail or telegram, you must send the notice no later than midnight of

_____

(or midnight of the third business day following the latest of the three events listed in Section 1 "Your Right To Cancel"). If you send or deliver your written notice to cancel some other way, it must be delivered to the above address no later than that time.

If more than one person has the right to cancel the account under this notice, a cancellation by any of those persons is effective to cancel the account for all of them.

**3. Acknowledgement of Receipt**
Each person signing below acknowledges receipt of two (2) copies of this notice of right to cancel and one (1) copy of the Federal Truth in Lending Disclosure.

SIGNATURE _____ DATE _____
\* SUSAN QUEALY-WASSER

SIGNATURE _____ DATE _____
\*

SIGNATURE _____ DATE _____
\*

SIGNATURE _____ DATE _____

**I WISH TO CANCEL:**

_SIGNATURE_ _____ _DATE_ 8/20/2007

00-05-3556NSB 12-2004

# Bank of America

**Open-End Credit Account
Notice of Right to Cancel-
Statement of Cancellation**

Bank Id# 995070111529050

Service Id# 68871801310199

**1.  Your Right To Cancel**
We have agreed to establish an open-end credit account for you, and have agreed to give us a deed of trust, mortgage, or similar lien on your home as security for your account. You have a legal right to cancel the account without cost, within three business days after the latest of the following events:

(a) the date you sign the Account Agreement for the line of credit secured by property located at

\* 28 JANICE LANE
  HYANNIS, MA 02601
_____ ; or

(b) the date you received your Truth-in-Lending disclosures; or
(c) the date you received this notice of your right to cancel the account.

If you cancel the account, the deed of trust, mortgage, or similar lien on your home is also canceled.  Within 20 calendar days after we receive your notice of cancellation, we must take the necessary steps to reflect the fact that the deed trust, mortgage or similar lien on your home has been canceled. We must also return to you any money or property you have given to us or to anyone else in connection with the account.

You may keep any money or property we have given you until we have done the things mentioned above, but you must then offer to return the money or property.  If it is impractical or unfair for you to return the property, you must offer its reasonable value.  You may offer to return the property.  Money must be returned to the address shown in Section 2 (How to Cancel).  If we do not take possession of the money or property within 20 calendar days of your offer, you may keep it without further obligation.

**2.  How to Cancel**
If you decide to cancel the account, you may do so by notifying us in writing, at BANK OF AMERICA, N.A.

_____
_____
_____

You may use any written statement that is signed and dated by you and states your intention to cancel, or you may use this notice by dating and signing below. Keep one copy of this notice because it contains important information about your rights.

If you cancel by mail or telegram, you must send the notice no later than midnight of

_____

(or midnight of the third business day following the latest of the three events listed in Section 1 "Your Right To Cancel").  If you send or deliver your written notice to cancel some other way, it must be delivered to the above address no later than that time.

If more than one person has the right to cancel the account under this notice, a cancellation by any of those persons is effective to cancel the account for all of them.

**3.  Acknowledgement of Receipt**
Each person signing below acknowledges receipt of two (2) copies of this notice of right to cancel and one (1) copy of the Federal Truth in Lending Disclosure.

| | |
|---|---|
| *SIGNATURE* | 8/18/2007 *DATE* |
| \* SUSAN QUEALY-WASSER | |
| *SIGNATURE* \* | *DATE* |
| *SIGNATURE* \* | *DATE* |
| *SIGNATURE* | *DATE* |

**I WISH TO CANCEL:**

| | |
|---|---|
| *SIGNATURE* | *DATE* |

00-05-3556NSB  12-2004

# EXHIBIT B

Susan Quealy-Wasser
43 Forest Glen Road
Hyannis, MA 02601

August 20, 2007

Bank of America, N.A.
100 North Tryon Street
Charlotte, North Carolina 28255

Re:    Right to Cancel
       Loan #:  68871801310199

To whom it may concern,

      Enclosed please find my notice of right to cancel form indicating my wish to cancel.

      I am offering to return the money or property you have given.

      Please provide further instructions.

                Thank you,

                Susan Quealy-Wasser

Encl.



**Open-End Credit Account**
**Notice of Right to Cancel-**
**Statement of Cancellation**

---

Bank Id# 995070111529050

Service Id# 68871801310199

**1.   Your Right To Cancel**
We have agreed to establish an open-end credit account for you, and have agreed to give us a deed of trust, mortgage, or similar lien on your home as security for your account. You have a legal right to cancel the account without cost, within three business days after the latest of the following events:

(a)  the date you sign the Account Agreement for the
line of credit secured by property located at

\*   28 JANICE LANE
HYANNIS, MA 02601
_____ ; or

(b)  the date you received your Truth-in-Lending
disclosures; or
(c)  the date you received this notice of your right to
cancel the account.

If you cancel the account, the deed of trust, mortgage, or similar lien on your home is also canceled.  Within 20 calendar days after we receive your notice of cancellation, we must take the necessary steps to reflect the fact that the deed trust, mortgage or similar lien on your home has been canceled.  We must also return to you any money or property you have given to us or to anyone else in connection with the account.

You may keep any money or property we have given you until we have done the things mentioned above, but you must then offer to return the money or property.  If it is impractical or unfair for you to return the property, you must offer its reasonable value.  You may offer to return the property.  Money must be returned to the address shown in Section 2 (How to Cancel).  If we do not take possession of the money or property within 20 calendar days of your offer, you may keep it without further obligation.

**2.   How to Cancel**
If you decide to cancel the account, you may do so by notifying us in writing, at BANK OF AMERICA, N.A.

_____

_____

_____

You may use any written statement that is signed and dated by you and states your intention to cancel, or you may use this notice by dating and signing below.  Keep one copy of this notice because it contains important information about your rights.

If you cancel by mail or telegram, you must send the notice no later than midnight of

_____

(or midnight of the third business day following the latest of the three events listed in Section 1 "Your Right To Cancel").  If you send or deliver your written notice to cancel some other way, it must be delivered to the above address no later than that time.

If more than one person has the right to cancel the account under this notice, a cancellation by any of those persons is effective to cancel the account for all of them.

**3.   Acknowledgement of Receipt**
Each person signing below acknowledges receipt of two (2) copies of this notice of right to cancel and one (1) copy of the Federal Truth in Lending Disclosure.

SIGNATURE                                    DATE
\*  SUSAN QUEALY-WASSER

SIGNATURE                                    DATE
\*

SIGNATURE                                    DATE
\*

SIGNATURE                                    DATE

**I WISH TO CANCEL:**

_____                    8/20/2007
SIGNATURE                                    DATE

00-05-3556NSB 12-2004

**SENDER:** *COMPLETE THIS SECTION*

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

BANK OF AMERICA
100 NORTH TRYON STREET
CHARLOTTE, N.C. 28255

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X *Jerry Williams*   ☐ Agent   ☐ Addressee

B. Received by ( Printed Name )   C. Date of Delivery
AUG 2 2 2007

D. Is delivery address different from item 1?  ☐ Yes
If YES, enter delivery address below:   ☐ No

3. Service Type
☑ Certified Mail   ☐ Express Mail
☐ Registered   ☐ Return Receipt for Merchandise
☐ Insured Mail   ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)   ☐ Yes

2. Article Number
(Transfer from service label)   7002 0510 0003 3335 6668

PS Form 3811, August 2001          Domestic Return Receipt          102595-02-M-1540



U.S. Postal Service
CERTIFIED MAIL RECEIPT
*(Domestic Mail Only; No Insurance Coverage Provided)*

CHARLOTTE NC 28255

| | | | |
|---|---|---|---|
| Postage | $ | $0.41 | 0601 |
| Certified Fee | | $2.65 | 04 |
| Return Receipt Fee (Endorsement Required) | | $2.15 | Postmark Here |
| Restricted Delivery Fee (Endorsement Required) | | $0.00 | |
| Total Postage & Fees | $ | $5.21 | 08/20/2007 |

Sent To
BANK OF AMERICA, N.A.
Street, Apt. No.; or PO Box No. 100 NORTH TRYON STREET
City, State, ZIP+4 CHARLOTTE, NORTH CAROLINA 28255

7002 0510 0003 3335 9999

PS Form 3800, January 2001                See Reverse for Instructions

# EXHIBIT C

USAA Savings Bank
P.O. Box 14050
Las Vegas, Nevada 89114-4050

BRIAN J WASSER                                                    December 4, 2007
43 FOREST GLEN RD
HYANNIS MA 02601-2537

Reference: Member # 22875367

Dear Mr. Wasser,

Thank you for your application for a credit card. After review of all information available to
us, we regret that we are unable to honor this request because of the following reasons:

- Time since delinquency is too recent or unknown
- Amount owed on accounts is too high
- Length of time accounts have been established
- Level of delinquency on accounts

The consumer reporting agency, which provided information that influenced our decision in
whole or in part, was:

Equifax Credit Info. Srv, Inc.
P. O. Box 740241
Atlanta, GA 30374-0241
(800)685-1111

The reporting agency is unable to supply specific reasons why we have denied credit to you.
You do, however, have the right under the Fair Credit Reporting Act to know the information
contained in your credit file. You also have a right to a free copy of your report from the
reporting agency, if you request it no later than 60 days after you receive this notice. In
addition, if you find that any information contained in the report you receive is inaccurate or
incomplete, you have the right to dispute the matter with the reporting agency. Any questions
regarding such information should be directed to the consumer reporting agency noted above.

If you have questions or need additional information about our decision, please give us a call
at **(800) 531-2265**.

Sincerely,

Underwriting Services
USAA Savings Bank

**Notice:** The Federal Equal Credit Opportunity Act prohibits creditors from discriminating against credit applicants on
the basis of race, color, religion, national origin, sex, marital status, age (provided the applicant has the capacity to
enter into a binding contract); because all or part of the applicant's income derives from any public assistance
program; or because the applicant has in good faith exercised any right under the Consumer Credit Protection Act.
The federal agency that administers compliance with this law concerning this creditor is Federal Deposit Insurance
Corporation, Credit Card Center, 2345 Grand Boulevard, Suite 100, Kansas City, MO 64108.

DM# 01661 - 50520-0805

